*LaPorte v. Blum*, No. 1167-11-13 Cncv (Toor, J., Mar. 17, 2015).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| WILLIAM LAPORTE, JAMES LAPORTE, and BURGESS SUGARHOUSE, LLC<br>  Plaintiffs<br><br>  v.<br><br>PAMELA B. BLUM, RICHARD W. BURGESS, NANCY B. RICE, and JUDITH K. BURGESS,<br>  Defendants | Docket No.1167-11-13 Cncv |

RULING ON THE MERITS

This is an intra-family dispute over an option to buy land. Plaintiffs are (1) the grandchildren of the former owners, and (2) the grandchildren's sugaring business. Defendants are Plaintiffs' aunts and uncles. Plaintiffs seek to enforce the option to purchase the family land on which they have been sugaring; Defendants filed a counterclaim seeking a declaration that they properly revoked the option in 2013.[1] A court trial was held on January 21 and 22 and post-trial filings were complete February 13.[2] Robert O'Neill, Esq. represents the Plaintiffs; Craig Weatherly, Esq. represents the Defendants.

Findings of Fact

The court finds the following facts to be established by a preponderance of the evidence. Lawrence W. Burgess and Ruth O. Burgess ("the Grandparents"), now deceased, owned and

---

[1] They also raised the defense of undue influence, but have withdrawn that claim.

[2] The court notes that Defendants' post-trial memo refers to some exhibits that were never offered in evidence, such as, by way of example, 29, 30 and 31.

lived on the Underhill land in question. They had run a sugarhouse on the land, with about 2,000 taps. In 2001 they realized the lines needed to be replaced and, at 80 and 81 years of age, they decided to stop sugaring. In 2004, their grandsons William and James hung a few buckets – perhaps 150 – and in 2005 started buying new sugaring equipment. The Grandparents put in about $10,000 to help with the roughly $52,000 worth of equipment. In 2005 they had about 1,000 taps going. William and James registered their trade name (Burgess Sugarhouse) in 2004. There is no evidence that the name had any value. William and James would not have invested the $52,000 if they had not been assured by their Grandparents that they could continue to sugar on the property.

At some point, Defendants became unhappy about the fact that the grandsons were running the sugaring operation. None of the Defendants testified, so it is not clear to the court why they objected.

The Grandparents offered to give William and James the land, but the boys declined. They discussed buying it, but because of concerns that the funds from a sale might reduce the Grandparents' Medicaid eligibility, that plan was rejected. The Grandparents met with lawyers to work out an estate plan, which ended up as follows: the land would be given to Lawrence and Ruth's five children in equal shares, and William and James would be given an option to buy the land. There would also be a lease allowing them to keep sugaring prior to execution of the option. The Grandparents were fully aware that the Defendants objected to the option, but went forward with it anyway. William and James told their Grandparents that they would not stay to sugar there without the option and the lease.

In May 2006, the property was deeded to the five children (the four Defendants plus the mother of William and James) with Lawrence and Ruth reserving a life estate. In addition, the

2

lease and option (the Option) were executed. Exs. 13-19. The lease runs until May 2021, with an option to renew for another fifteen years. Ex. 14. The Option permits William and James to buy the land for $400,000. Ex. 13, ¶ 3. It has two parts: one an option to buy the residence and one for the balance of the land. Each is priced at $200,000. The residence option could not be exercised until after the Grandparents were no longer living there, and even then only with their permission. The option on the balance of the land could be exercised sooner. Both options would expire if not exercised within nine months after the later of both Grandparents' deaths. Id. ¶ 2.

Defendants sent Requests for Admissions in July of 2014 to which Plaintiffs failed to respond, and they are thus deemed admitted. They state that the fair market value was higher than $400,000 both at the time the Option was issued and as of July 2014. However, there is no other evidence as to fair market value. Thus, the court cannot say whether the land is worth $1 more, or $100,000 more, than the Option price.

The Option has the usual recitation that it is given for "Ten Dollars and other good and valuable consideration." No one recalls ten dollars being exchanged at the closing. The lawyer who drafted the Option testified that in fifty years of closings he never saw anyone exchange the dollars recited as consideration.

In 2010 Lawrence revised his will. It leaves a one quarter interest in the real estate to each of the Defendants, but not to the fifth daughter, William and James' mother. Ex. 28, ¶ 6.1(a).[3] This was the result of the family dispute over the grandsons getting the Option, which led their mother to say her siblings could have her share. The will also states that it is Lawrence's intent "to provide my grandsons, JAMES LAPORTE and WILLIAM LAPORTE, the benefits of the option and lease" referenced therein. Id. ¶ 6.1(d). It was the Grandparents' desire that

---

[3] It is unclear whether the deeds were also revised at that time, but the court presumes they were. Likewise, the court presumes that Ruth's interests had already been transferred to Lawrence. No one has raised any issue about those aspects of the case.

William and James continue to run a sugaring operation on the property after the Grandparents' deaths.

William and James continued to run the sugaring operation. Lawrence and Ruth both died in 2013. In June of 2013, Defendants sent a letter to William and James saying that "the offer represented by the Option is hereby withdrawn, and . . . no purported exercise of the Option by you hereafter will be recognized as valid." Ex. 33. In September of 2013, William and James obtained financing and sent a letter attempting to exercise the Option. Ex. 35. This lawsuit followed.

Conclusions of Law

Plaintiffs seek to enforce the Option as written. Defendants argue that because the ten dollars recited in the Option was never paid, the Option was not supported by consideration and is therefore unenforceable.

The Restatement (Second) of Contracts states that an "option agreement is not invalidated by proof that the recited consideration was not in fact given." Restatement (Second) of Contracts § 87 cmt c (1981); *see also*, 3 Williston on Contracts § 7.21 (4th ed.) ("In one very important respect, *the recital* or payment of a small sum, under the modern view, will suffice to make a promise enforceable. This occurs when the promise is contained *in an option contract*.")(emphasis added). Another court has noted that "[t]he authors of the national treatises on contracts have generally endorsed" this view. 1464-Eight, Ltd. v. Joppich, 154 S.W.3d 101, 109 (Tex. 2004). The Joppich court also pointed out that "the authors of law review commentary have agreed that the nonpayment of a recited nominal consideration should not preclude enforcement of a written option agreement." Id. at 111.

4

As is often the case, it does not appear that the Vermont Supreme Court has yet addressed this question. However, the Restatement approach is reasonable because it seeks to enforce the intent of the parties to the document at issue. As the evidence shows, it is typical to recite a few dollars as consideration but not expect it to be paid. To hold that every such agreement is void would not be in keeping with the intent of the parties to such options. Moreover, the Supreme Court's trend is to adopt the more modern views expressed in the Restatements. Thus, the court predicts that it would do so here. In the absence of any controlling authority, the court will therefore apply the Restatement approach. The recital of consideration is thus sufficient, regardless of whether it was actually paid.

While "gross disproportion between the payment and the value of the option" may make an option unenforceable, that is not the case here. Restatement at § 87 cmt. b. There is no evidence here as to the fair market value of the property. It may be $100 more than the $400,000 option price, or $100,000 more, but there is no evidence from which the court can make such a determination. Thus, there is no evidence of "gross disproportion."

In any case, the court finds that there was "other consideration" for the Option aside from the recital of ten dollars: the fact that William and James remained on the family land to continue running the sugaring operation that the Grandparents could no longer manage themselves. The Grandparents desired that continuity, and offered the Option in exchange for that commitment by William and James. It is true that William and James had already spent considerable funds on equipment prior to the Option, but that does not undercut the value of their remaining on the land and running the operation after May 2006. William testified that they expressly told their Grandparents that they would not stay to sugar there without the Option and the lease. This is highly credible given the known opposition from Defendants, and the risk that they would seek

5

to remove William and James once the Grandparents died. The fact that the Grandparents went forward with the Option in the face of the known opposition of four of their five children makes clear that they heavily valued having William and James continue the family's sugaring operation.

While the court cannot place an exact dollar value on the continuation of the sugaring operation, that is not necessary to sustain the Option. "[A]nything which fulfills the requirement of consideration will support a promise, regardless of the comparative value of the consideration and of the thing promised. The rule is almost as old as the doctrine of consideration itself." 3 Williston on Contracts § 7.21 (4th ed.); *see also*, Restatement (Second) of Contracts § 87, cmt a (1981) (in analyzing option contracts, "courts do not ordinarily inquire into the adequacy of the consideration bargained for."). In any case, continuation of a family farm or family business is often of very high value to older family members, and the evidence here supports a conclusion that it was so valued by the Grandparents. There was adequate consideration here.

Defendants also argue that the Option could be withdrawn, as they did in June of 2013. The court disagrees. "An option is a continuing offer, and if supported by a consideration, it cannot be withdrawn before the time limit." Buchannon v. Billings, 127 Vt. 69, 75 (1968). It is "an agreement by which one binds himself to sell and convey to another party certain property at a stipulated price within a designated time." Id. at 74. "The optionor is bound that the offer shall be kept open and available in accordance with its terms[.]" Id.; *see also* 1 Williston on Contracts § 5:16 (4th ed.) ("During the option period the irrevocable offer may only be modified, released or rescinded by agreement of the parties. It cannot be unilaterally withdrawn.").

Thus, Defendants did not have the right to revoke the Option. Plaintiffs exercised it in September 2013, within the nine-month period after their grandfather's death. It became a binding, enforceable contract at that time.

<u>Order</u>

The court will enter judgment for Plaintiffs William and James LaPorte. The Option is enforceable and has not been revoked.

Dated at Burlington this 17th day of March, 2015.

_____
Helen M. Toor
Superior Court Judge